983 F.Supp. 1418 (1997)
Luis E. MORALES, Plaintiff,
v.
ATTORNEYS' TITLE INSURANCE FUND, INC., Defendant.
Ronald L. SNYDER and Joyce A. Snyder, on behalf of themselves and all others similarly situated, Plaintiff,
v.
COMMONWEALTH LAND TITLE INSURANCE COMPANY, Defendant.
Mary Ann EICHELHARDT, on behalf of herself and all others similarly situated, Plaintiff,
v.
LAWYERS TITLE INSURANCE CORPORATION, Defendant.
Michelle SUTTON and Gregory S. Sutton, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
CHICAGO TITLE INSURANCE COMPANY, INC., Defendant.
James C. O'BRIEN, Ingrid K. O'Brien, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
STEWART TITLE GUARANTY COMPANY, Defendant.
Linda DICACCIO, on behalf of herself and all others similarly situated, Plaintiff,
v.
FIRST AMERICAN TITLE INSURANCE COMPANY, Defendant.
Christopher J. ELIADES, on behalf of himself and all others similarly situated, Plaintiff,
v.
AMERICAN PIONEER TITLE INSURANCE COMPANY, Defendant.
John A. DUNN and Staci L. Dunn, on behalf of themselves and all similarly situated, Plaintiff,
v.
FIDELITY NATIONAL TITLE INSURANCE COMPANY, Defendant.
Nos. 96-2468-Civ, 96-2469-Civ, 96-2542-Civ, 9-2706-Civ, 96-2707-Civ, 96-2708-Civ, 96-3088-Civ.
United States District Court, S.D. Florida.
July 3, 1997.
*1419 Joseph W. Phebus, Phebus, Winkelmann, Wong & Bramfeld, Urbana, IL, Christopher B. Horn, Phebus, Winkelmann, Wong & Bramfeld, Chicago, IL, Nancy J. Glidden, Phebus, Winkelmann, Wong & Bramfeld, West Chester, Pennsylvania, D. Michael Campbell, Miami, FL, for Plaintiffs.
Mark A. Brown, Steven C. Dupre, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, FL, for Attorneys' Title Insurance Fund, Inc.
Stuart H. Singer, Carlos M. Sires, Kirkpatrick & Lockhart, L.L.P., Miami, FL, for Commonwealth Land Title Insurance Company.
Alan T. Dimond, Robert H. Fernandez, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, FL, Hale and Door, John C. Christie, Jr., David A. Wilson, Wendy E. Anderson, Washington, DC, for Chicago Title Insurance Company, Inc.
Neil P. Linden, Rollnick & Linden, P.A., Coral Gables, FL, for Stewart Title Guaranty Company.
Kevin X. Crowley, William H. Hughes, III, Cobb, Cole & Bell, Tallahassee, FL, for American Pioneer Title Insurance Company.
Marty Steinberg, William F. Hamilton, Daniel S. Gelber, Bruce Hoffman, Holland & Knight, L.L.P., Miami, FL, for Fidelity National Title Insurance Company of Pennsylvania.
Thomas R. Tatum, Brinkley, McNerney, Morgan, Solomon & Tatum, L.L.P., Ft. Lauderdale, FL, for First American Title Insurance Company.
Michael A. Cohn, Awerbach & Murphy, P.A., Clearwater, FL., W. Wyndham Geyer, Jr., Ruden, McClosky, Smith, Schuster & Russell, P.A., Ft. Lauderdale, FL, for Lawyers Title Insurance Corporation.

OMNIBUS ORDER
HIGHSMITH, District Judge.
THESE CAUSES came before the Court upon the following motions:
*1420 (1) Defendant Attorneys' Title Insurance Fund, Inc.'s ("Attorneys' Title") motion to dismiss first amended class action complaint (D.E. # 34 in Case No. 96-2445);
(2) Defendant Attorneys' Title's motion to strike plaintiff's claim for punitive/exemplary damages (D.E. ft 35 in Case No. 96-2445);
(3) Defendant Commonwealth Land Title Insurance Company's ("Commonwealth") motion to dismiss (D.E. # 30 in Case No. 96-2468);
(4) Defendant Lawyers Title Insurance Corporation's ("Lawyers Title") motion to dismiss first amended class action complaint (D.E. # 27 in Case No. 96-2469);
(5) Defendant Lawyers Title's motion to strike plaintiff's claim for punitive/exemplary damages (D.E. # 29 in Case No. 96-2469);
(6) Defendant Chicago Title Insurance Company, Inc.'s ("Chicago Title") motion to dismiss (D.E. # 23 in Case No. 96-2542);
(7) Defendant Chicago Title's motion to strike plaintiff's claim for punitive/exemplary damages (D.E. # 25 in Case No. 96-2542);
(8) Defendant Stewart Title Guaranty Company's ("Stuart Title") motion to dismiss plaintiff's first amended class action complaint (D.E. # 26 in Case No. 96-2706);
(9) Defendant Stewart Title's motion to strike plaintiff's claim for punitive/exemplary damages (D.E. # 25 in Case No. 96-2706);
(10) Defendant First American Title Insurance Company's ("First American") motion to dismiss first amended complaint (D.E. # 27 in Case No. 96-2707);
(11) Defendant First American's motion to strike plaintiff's claim for punitive/exemplary damages (D.E. # 29 in Case No. 96-2707);
(12) Defendant American Pioneer Title Insurance Company's ("American Pioneer") motion to dismiss plaintiff's first amended class action complaint (D.E. # 28 in Case No. 96-2708);
(13) Defendant American Pioneer's motion to strike plaintiff's claim for exemplary damages (D.E. # 30 in Case No. 96-2708);
(14) Defendant American Pioneer's motion for abstention (D.E. # 29 in Case No. 96-2708); and
(15) Defendant Fidelity National Title Insurance Company of Pennsylvania's ("Fidelity") motion to dismiss (D.E. # 19 in Case No. 96-3088).
At a status conference held on March 12, 1997, the Court determined that, due to their similarities, the above-styled cases would be consolidated for the purpose of ruling on common issues of law. In accordance with that determination and as further articulated in its Order dated March 13, 1997, the Court addresses the foregoing motions in a consolidated fashion. Hence, all of the Court's rulings contained in this Omnibus Order are applicable to all of the above-styled cases.

PROCEDURAL AND FACTUAL BACKGROUND
The plaintiffs in the above-styled cases allege that they are persons who "have purchased or refinanced real property in the State of Florida and, pursuant to that purchase or refinancing, have purchased title insurance from the [defendants] through [their] title agents."[1] Each of the defendants is a title insurance company operating in Florida.[2] The plaintiffs bring the following common claims:
Count 1: Violation of Section 2607(a) of the Real Estate Settlement Procedures Act ("RESPA");
Count 2: Violation of Section 2607(b) of RESPA;
Count 3: Common law fraudulent misrepresentation and/or omission:
Count 4: Common law negligent misrepresentation and/or omission; and

*1421 Count 5: Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq.
The claims are brought in the form of class action complaints. In its Order dated March 13, 1997, the Court stayed the motions for class certification which had been filed in each of the eight cases, pending disposition of the motions to dismiss addressed here. Accordingly, the Court will not discuss in this Omnibus Order any of the class action allegations contained in the complaints.[3]
The plaintiffs invoke the Court's federal question jurisdiction with respect to Counts 1 and 2, pursuant to 28 U.S.C. § 1331. According to RESPA's jurisdictional provision, 12 U.S.C. § 2614, actions pursuant to Section 2607 of RESPA, "may be brought in the United States district court or in any other court of competent jurisdiction, for the district in which the property involved is located, or where the violation is alleged to have occurred." Using identical language in each of the complaints, the plaintiffs allege that "a substantial part of the events or omission giving rise to the claims made herein occurred within this judicial district and a substantial part of the property that is the subject of this action is situated within this judicial district."[4] The plaintiffs invoke the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), with respect to the state law claims asserted in Counts 3, 4 and 5.

DISCUSSION

1. Preliminary Considerations and Statement of the Plaintiffs' Federal Claims:

Pursuant to Title 28, United States Code, Section 1367(c)(3), a court whose supplemental jurisdiction has been invoked over one or more claims, may decline to exercise such jurisdiction if it has dismissed all claims over which it has original jurisdiction. The Court intends to exercise this discretion provided the outcome warrants it. Therefore, the Court first addresses the defendants' arguments in support of dismissal of the federal claims contained in Counts 1 and 2, over which it has original jurisdiction.
As previously noted, all of the plaintiffs assert claims for violations of RESPA in Counts 1 and 2. Count 1 relies upon Title 12, United States Code, Sections 2607(a), which provides:
No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.
Count 2 relies upon Title 12, United States Code, Section 2607(b), which provides:
No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.
Section 2607(c), however, provides the following exemption:
Nothing in this section shall be construed as prohibiting (1) the payment of a fee ... (B) by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance or ... (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities *1422 actually furnished or for services actually performed.
In Count 1, the plaintiffs allege that each of the defendant title insurance companies "gave fees, kickbacks, and/or other things of value (including payments, advances, funds, loans, services, or other consideration) pursuant to written or oral agreements or understandings with title agents (including, but not limited to, sales agents, mortgage brokers or lenders, settlement attorneys, and other persons or entities who handled [plaintiffs'] real estate transactions)."[5] The plaintiffs further allege that, "Such fees, kickbacks, and/or other things of value amounted to far more than the mere payment of a fee by [each] Defendant to its duly appointed agent for services actually performed in the issuance of a policy of title insurance."[6] In Count 2, the plaintiffs allege that each of the defendant title insurance companies "gave certain portions, splits, and/or percentages of title insurance premiums paid by [plaintiffs] pursuant to written or oral agreements with title agents (including, but not limited to, sales agents, mortgage brokers or lenders, settlement attorneys, and other persons or entities who handled [plaintiffs'] real estate transactions)."[7] The plaintiffs further allege that, "Such portions, splits or percentages amounted to far more than the mere payment of a fee by [each] Defendant to its duly appointed agent for services actually performed in the issuance of a policy of title insurance"; and that, "Such portions, splits or percentages of the title insurance premium retained by [defendants'] title agents are not commensurate with the services actually performed by those agents."[8]
As codified in Title 12, United States Code, Section 2607(d), RESPA provides a private right of action for violations of the Act. Section 2607(d) provides, in pertinent part:
(2) Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.
. . . . .
(5) In any private action brought pursuant to this subsection, the court may award to the prevailing party the court costs of the action together with reasonable attorneys fees.
In Count 1, the plaintiffs seek judgment "in an amount equal to three times the amount of any charges for title insurance and title evidence paid to [each] Defendant and/or its title agents by [plaintiffs]."[9] In Count 2, the plaintiffs seek the same relief, but only with respect to charges for title insurance; i.e., not for title evidence.[10] As to both counts, the plaintiffs also seeks pre-judgment and post-judgment interest and reasonable attorneys' fees and costs. Finally, the plaintiffs seek a permanent injunction requiring each of the defendants "to cease its continuing of (sic) violation" of Sections 2607(a) and (b), as alleged in Count 1 and Count 2, respectively.[11]

2. Burford Abstention:

First, the Court first considers the defendants' request for abstention, pursuant to Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). As noted by the undersigned in Tax Cap Comm. v. *1423 Save Our Everglades, Inc., 933 F.Supp. 1077 (S.D.Fla.1996), "Burford abstention is appropriate when exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." Id. at 1082 (quoting Rindley v. Gallagher, 929 F.2d 1552, 1556 (11th Cir.1991)). Before addressing the potential applicability of Burford abstention to the plaintiffs' RESPA claims, the Court must delve further into RESPA's framework and RESPA's interplay with state laws, particularly, Florida law.
In 1974, Congress enacted RESPA based on the findings and purposes articulated in Title 12, U.S.C. § 2601:
(a) The Congress finds that significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country. The Congress also finds that it has been over two years since the Secretary of Housing and Urban Development and the Administrator of Veterans' Affairs submitted their joint report to the Congress on "Mortgage Settlement Costs" and that the time has come for the recommendations for Federal legislative action made in that report to be implemented.
(b) It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result 
(1) in more effective advance disclosure to home buyers and sellers of settlement costs;
(2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services;
(3) in a reduction in the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance; and
(4) in significant reform and modernization of local record-keeping of land title information.
Title insurance is one of the various "settlement services" that fall within the reach of RESPA. See 12 U.S.C. § 2602(3). In enacting RESPA, Congress considered, but rejected, the possibility of establishing federal rate controls in connection with settlement services, such as title insurance. See S.REP. No. 93-866 (1974), reprinted in, 1974 U.S.C.C.A.N., 6545, 6549-50. Indeed, Congress felt that "Federal authority to establish rates for settlement charges would infringe on an area that has historically been of State or local concern and, in some instances, would duplicate existing State regulatory schemes." Id. at 6550.
Florida is one state which has a regulatory scheme in place with respect to title insurance rates. Florida law provides: "A person may not knowingly quote, charge, accept, collect, or receive a risk premium for title insurance other than the risk premium adopted by the [Department of Insurance]." Fla. Stat. § 627.780(1). Chapter 627 further provides that the Department of Insurance "must adopt a rule specifying the risk premium to be charged in this state by insurers" and establish "related rules to ensure that the amounts required to be maintained by the insurer are not less than 30 percent of the risk premium for policies sold by agents." Fla. Stat. § 627.782(1). In accordance with the legislative mandate, the Department of Insurance has promulgated the risk rate premiums to be charged by title insurers in Florida for various types of title insurance contracts. FLA. ADMIN. CODE ANN. R. 4-186.003 (1995). For residential property, the Owner's and Mortgage Rate are both currently set at $5.75 per thousand dollars, with provisions covering simultaneous issuance. FLA. ADMIN. CODE ANN. R. 4-186.003(1)-(6) (1995). Moreover, in accordance with the statute, the Department of Insurance has specified a minimum percentage of premium which must be retained by Florida's title insurers:
A title insurer shall receive and retain at least 30% of the risk premium for policies sold by agents, including risk premium for *1424 endorsements, and it shall not be decreased, directly or indirectly, by an insurer providing services to any agent for less than actual cost.
Any retention of premium by an insurer in excess of 30% shall not be decreased, directly or indirectly, by providing services to an agent for less than actual cost.
FLA.ADMIN.CODE ANN.R. 4-186.003(11)(a)-(b) (1995).
In their complaints, the plaintiffs acknowledge the existence of these state laws and regulations. They allege, however, that the defendants' title agents in Florida "always or nearly always received and continue to receive 70% of the promulgated title insurance risk premiums paid by the [plaintiffs]"; and that "[t]his scheme resulted and continues to result in the giving by [each] Defendant of a fee, kickback, or thing of value to the title agents and/or a split of the premium not commensurate with services actually performed."[12] In a nutshell, the common theory running through the plaintiffs' cases is that, despite ostensive compliance with Florida's applicable laws and regulations, the defendants have violated RESPA. To put it another way, the plaintiffs are challenging, under RESPA, the defendants' alleged practice of "always or nearly always" adhering to a 70/30 split of title insurance premiums with their agents, even though such a percentage split is explicitly allowed by Florida law.
In asking the Court to exercise Burford abstention, the defendants point to Florida's regulatory scheme which governs both title insurance rates and the division of premiums between title insurance companies and their agents. According to the defendants, any determination by this Court with respect to the plaintiffs' RESPA claims would be disruptive of Florida's efforts to regulate the provision of title insurance to its citizens. While the defendants' arguments in favor of Burford abstention appear meritorious, closer examination of the doctrine counsels against its application to the plaintiffs' RESPA claims, to the extent that they seek money damages.[13]
In Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996), the United States Supreme Court considered the applicability of Burford abstention to a suit for money damages. In reviewing the various federal abstention doctrines, the Supreme Court "located the power to abstain in the historic discretion exercised by federal courts sitting in equity." Id. at ___, 116 S.Ct. at 1721. The Supreme Court further stated that, through its abstention jurisprudence, it had "recognized that the authority to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief." Id. at ___, 116 S.Ct. at 1722. The Supreme Court acknowledged, however, that it had not "previously addressed whether the principles underlying our abstention cases would support the remand or dismissal of a commonlaw action for damages." Id. Although it did not declare Burford abstention completely inapplicable to damages actions, the Supreme Court concluded that "federal courts have the power to dismiss or remand cases based on abstention principles only where the relief *1425 being sought is equitable or otherwise discretionary." Id. at ___, 116 S.Ct. at 1728.
The parties have cited, and the Court's own research has uncovered, several opinions from various circuit courts that help define the parameters of the Quackenbush opinion. On two occasions, the Eleventh Circuit has acknowledged the divergent approaches to abstention imposed by Quackenbush, depending on the type of relief sought. In Pompey v. Broward County, 95 F.3d 1543 (11th Cir.1996), the Eleventh Circuit stated, "It is doubtful that federal district courts may dismiss claims for damages under abstention principles." Id. at 1552 n. 12 (citing Quackenbush, 517 U.S. at ___ - ___, 116 S.Ct. at 1727-28). Moreover, in McKusick v. City of Melbourne, 96 F.3d 478 (11th Cir. 1996), the Eleventh Circuit stated, "Any future claims for damages that [the plaintiff] might bring for an arrest without probable cause would not be subject to dismissal under the abstention principles governing her present claim for equitable relief." Id. at 489 (citing Quackenbush, 517 U.S. at ___ - ___, 116 S.Ct. at 1720-23). The Court interprets these statements as an indication that the Eleventh Circuit would not dismiss a claim for money damages under Burford abstention principles.
In a case cited by the defendants, Amerson v. Iowa, 94 F.3d 510 (8th Cir.1996), the Eighth Circuit affirmed the district court's application of abstention principles to a § 1983 case. The Eighth Circuit found the case analogous to Fair Assessment in Real Estate, Ass'n Inc. v. McNary, 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981), which was also predicated on 42 U.S.C. § 1983 and was dismissed on abstention grounds. Noting that the Supreme Court in Quackenbush distinguished but did not overrule Fair Assessment, the Eighth Circuit concluded that the plaintiff's damages were dependent on a preliminary declaration invalidating the state court's termination of her parental rights and that such declaration was "itself akin to a declaratory judgment, which is discretionary in nature within the meaning of Quackenbush and Fair Assessment." Amerson, 94 F.3d at 513. The rationale of Fair Assessment and Amerson might be applicable to the plaintiffs' RESPA claims under the theory that adjudication of the claims would require invalidation of Florida's title insurance regulatory scheme. However, a close reading of Quackenbush reveals that the narrow exception carved for Fair Assessment was predicated on the Supreme Court's characterization of that case as addressing "the scope of the § 1983 cause of action." Quackenbush, 517 U.S. at ___, 116 S.Ct. at 1722. Because the plaintiffs' claims are predicated on RESPA, not on 42 U.S.C. § 1983, the Court declines the defendants' invitation to abstain pursuant to Fair Assessment and Amerson.
Finally, the Court considers Sierra Club v. City of San Antonio, 112 F.3d 789 (5th Cir. 1997), another post-Quackenbush case cited by the defendants. In Sierra Club, the Fifth Circuit affirmed the district court's dismissal, on Burford abstention grounds, of a suit brought pursuant to the Endangered Species Act. Like the plaintiff's claim in Sierra Club, the plaintiffs' RESPA claims, here, are grounded in federal law. In Tax Cap Comm., the undersigned similarly addressed claims arising from federal law, namely, trade dress infringement and false designation of origin under the Lanham Act. Thus, the defendants seek application of the Sierra Club and Tax Cap Comm. rationales to the plaintiffs' RESPA claims. The significantly distinguishing factor between Sierra Club and Tax Cap Comm. on the one hand, and the plaintiffs' RESPA claims on the other, is that, in the former, the plaintiffs sought a preliminary injunction. After disposing of the plaintiffs' prayers for injunctive relief, these cases only seek money damages. Therefore, the Court concludes that, in light of Quackenbush and the Eleventh Circuit's post-Quackenbush pronouncements cited above, Sierra Club and Tax Cap Comm. are inapplicable to the plaintiffs' RESPA claims.
Based on the foregoing considerations, the Court concludes that Burford abstention is inappropriate with respect to the plaintiffs' RESPA claims, which after dismissal of the prayers for injunctive relief, constitute suits for money damages. Therefore, the Court proceeds to address the defendants' substantive arguments in support of dismissal of the RESPA claims.

*1426 3. The Filed Rate Doctrine:

The first of these arguments, which the Court finds dispositive, is that the filed rate doctrine bars the plaintiffs' RESPA claims. The parties have not cited, and the Court has been unable to locate, any case squarely addressing this issue. Therefore, the Court must use as a guide cases which apply the filed rate doctrine to other federal claims. One such case is Taffet v. Southern Co., 967 F.2d 1483 (11th Cir.1992) (en banc). In Taffet, the Eleventh Circuit, sitting en banc, affirmed the dismissal of the RICO claims presented in two cases under review, pursuant to the filed rate doctrine, where the plaintiffs sought recovery against public utilities for allegedly excessive charges for electrical power.[14] After recounting the origins and development of the filed rate doctrine, the Eleventh Circuit stated, "As the cases discussed above illustrate, the filed rate doctrine recognizes that where a legislature has established a scheme for utility rate-making, the rights of the rate-payer in regard to the rate he pays are defined by that scheme." Taffet, 967 F.2d at 1490. The Eleventh Circuit then proceeded to examine the rate-making schemes for electric power adopted by the two states involved in the actions under review, Alabama and Georgia. The result of this examination was summarized by the Eleventh Circuit as follows:
In sum, the legislatures of both Alabama and Georgia have provided by law that the [Public Service Commissions] shall establish the legal rate for a utility's services. A consumer of a utility's services has the right to participate in the rate-setting process within the parameters set up by the legislature. The consumer, however, has no legal right to pay any rate other than the one established by the PSC.
The appellants in the instant cases paid utility rates established by the PSC's. They had no legal right to pay any other rate. Since "injury implies violation of a legal right," Keogh v. Chicago & Northwestern Ry., 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922), the appellants suffered no legally cognizable injury by virtue of paying the filed rates. Thus, the appellants have failed to state a claim upon which relief can be granted under RICO.
Taffet, 967 F.2d at 1494. In reaching this conclusion, the Eleventh Circuit noted that, "The rate-setting schemes in both Alabama and Georgia are incompatible with a rate-payer's cause of action to recover damages measured by the difference between the filed rate and the rate that would have been charged absent some alleged wrong doing." Id. at 1491.
Like the regulatory schemes discussed in Taffet, Florida's regulation of title insurance rates is comprehensive.[15] Moreover, like Alabama's and Georgia's rate-setting schemes, Florida's system allows public input into the rate-making process, a factor which the Taffet court found significant.[16] Rather than dispute any of these issues, the plaintiffs argue that the filed rate doctrine has no applicability to their RESPA claims because in their complaints they do not
assert any right to a reasonable rate for title insurance, nor [do they] seek damages measured by the difference between the actual rate and a hypothetical "reasonable" rate. Rather, [plaintiffs assert their rights] under federal law to money damages based on a formula set by Congress. See 12 U.S.C. § 2607(d)(2). If successful in proving [their] claims under RESPA, that formula gives [plaintiffs] the right to recover from [the defendants] three times *1427 the amount they paid for title insurance and three times the amount they paid for title evidence. Clearly that formula does not call upon the court to establish a hypothetical reasonable rate nor does the formula provide for a refund [to the plaintiffs] of an alleged "overcharge."[17]
The Court notes that the plaintiffs' response is different with regard to the applicability of the doctrine to Count 5. The plaintiffs acknowledge that recovery under Count 5 "does depend upon a finding by the court that the actual price of title insurance exceeds the reasonable price of title insurance."[18] The plaintiffs then ask for leave to "plead over" should the Court find that Count 5 is barred by the filed rate doctrine. The reason for the plaintiffs' posture is evident from an examination of Fla. Stat. § 501.211(2), upon which Count 5 is predicated. Section 501.211 provides for the recovery of "actual damages," thereby requiring such a comparison.[19]
Thus, the plaintiffs practically concede that any determination by this Court regarding the reasonableness of Florida's promulgated title insurance rates would be barred by the filed rate doctrine. To avoid this pitfall, the plaintiffs argue that RESPA allows recovery of the entire title insurance and title evidence charges each one of them paid, rather than the portion of such charges that allegedly represents a kickback or split prohibited by RESPA. The plaintiffs' argument is not supported by a fair reading of RESPA, by its legislative history or by cases addressing other types of settlement charges.
The RESPA damages provision invoked by the plaintiffs is codified at Title 12, United States Code, Section 2607(d)(2). This section was quoted earlier in this order, but is reproduced here for ease of reference. It provides, in pertinent part:
Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.
Under the plaintiffs' literal approach to this language, recovery under RESPA would be three times the full amount of a settlement charge, regardless of the nature or extent of the alleged RESPA violation. According to the statute, however, damages consisting of three times the charge paid for a settlement service may be recovered by the "person charged for the settlement service involved in the violation." (emphasis added). Thus, a better reading of the statute is that the damage award consist of three times the amount which violates RESPA. Examination of another recovery provision found in RESPA supports this reading of section 2607(d)(2). In section 2608(a), RESPA prohibits sellers from requiring that title insurance be purchased from any particular company. The damages for a violation of this section consist of "an amount equal to three times all charges made for such title insurance." 12 U.S.C. § 2608(b). Reading the two damages sections in pari materia, it is obvious that, in situations where Congress intended damages to be based on the entire amount of the settlement charge, it made such intention clear and unambiguous through the use of the words "all charges." Had Congress intended the same measure of damages with regard to section 2607(d)(2), it would have used the same language.
Moreover, RESPA's legislative history contradicts the plaintiffs' reading of section 2607(d)(2). In the passage entitled "Prohibition Against Kickbacks and Unearned Fees", *1428 which pertains to section 2607, the Senate Report states, "Subsection 7(d) imposes both criminal and civil penalties on any person or persons who violate the provisions of the section.... [A]ny person or persons who violate the provisions of the section shall be liable to the person whose business has been referred for three times the amount of the proscribed payment, kickback or referral fee." S.REP. No. 93-866 (1974), reprinted in 1974 U.S.C.C.A.N. 6546, 6552 (emphasis added). Similarly, in the "Section-by-Section Summary" of the law, the Senate Report characterizes the damages recoverable under section 7(d) as "treble damages sustained by injured parties." Id. at 6556. Thus, the legislative history supports the Court's fair reading of the statutory language, rather than the one advanced by the plaintiffs.
Finally, the Court looks to case law for further guidance. In Durr v. Intercounty Title Co. of Ill., 826 F.Supp. 259 (N.D.Ill. 1993), the court rejected an approach to damages computation under RESPA that is identical to that espoused by the plaintiffs. In Durr, the plaintiff brought a RESPA claim, asserting that the defendant had charged him fees for recording a deed and a mortgage that were in excess of the actual fees and costs incurred by the defendant. The plaintiff sought recovery of three times the entire amount he had paid, rather than three times the difference between the charges and the actual costs. The district court rejected this interpretation, characterizing the plaintiff's arguments as "entirely bogus in terms of both the RESPA statutory language and its purpose." Id. at 264-65. Ultimately, the district court imposed Rule 11 sanctions upon the plaintiff and, on appeal, the Seventh Circuit affirmed. See Durr v. Intercounty Title Co. of Ill., 14 F.3d 1183 (7th Cir.1994). The Seventh Circuit stated that, despite being offered repeated opportunities to remove the legitimate charges from his damages request, thereby curing an "unsupported" and "frivolous" damage theory, the plaintiff did not heed the obvious warnings from the district court. Id. at 1188. Therefore, Rule 11 sanctions were appropriate. Id. at 1189.
Having reviewed the statutory language, the legislative history, and case authorities, the Court concludes that the plaintiffs' proposed computation of damages under RESPA lacks merit. Moreover, even if the plaintiffs were correct, their RESPA claims must fall in the face of the filed rate doctrine. In their latest submission to the Court, the plaintiffs acknowledge that "purchasers of title insurance in Florida ... must pay the promulgated rate regardless of where or from whom they purchase their title insurance."[20] Under the plaintiffs' "total charge" theory, they would be able to recover, not a portion, but the entire title insurance premium which they were obligated to pay under Florida law. Moreover, that amount would be trebled pursuant to RESPA. Such a result would violate the filed rate doctrine even if the Court did not have to devise a reasonable rate to supplant Florida's promulgated rate. As noted by the Second Circuit in Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17 (2d Cir.1994), the filed rate doctrine protects two separate interests, "one concerned with potential discrimination in rates as between ratepayers and the other concerned with the justiciability of determining reasonable rates." Id. at 19. The plaintiffs' proposed recovery under RESPA would result in discrimination against other purchasers of title insurance in Florida who have paid, and will pay, the promulgated rate. Moreover, the fact that the plaintiffs are bringing their claims in the form of class actions is no answer to this problem. Addressing this issue, the Wegoland court stated, "the class action nature of the proceeding in no way affects the important concerns of agency authority, justiciability, and institutional competence previously described. To the contrary, use of the class action to attack the rate-making process tends to frustrate these legitimate interests and might end up costing the consumers even more in litigation expenses.... Because most of the animating policies behind the filed rate doctrine are not diminished in the class action context, we hold that the filed rate doctrine applies whether or not plaintiffs are suing for a *1429 class." Id. at 22. Thus, even if the Court were to accept their theory of damages, the plaintiffs cannot evade the filed rate doctrine.
But the problem with plaintiffs, thesis runs deeper. At the core of the filed rate doctrine is the issue of standing. To invoke the judicial power conferred by Article III of the United States Constitution, a plaintiff must assert an "injury in fact" and, absent such assertion, a federal court lacks jurisdiction. See Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). In their complaints, the plaintiffs have alleged that, "The practices of underpricing title evidence and permitting title agents to retain a split of the title insurance premium have generated significant losses for [defendants], and [defendants] have used those losses to justify increases in the title insurance rate in Florida. Such increases have resulted in grossly overpriced title insurance premiums to the damage and detriment of the [plaintiffs]"[21] It is evident from this language that, despite their protestations, the plaintiffs' claims are nothing more than a challenge to Florida's rate structure. Paying "grossly overpriced title insurance premiums" is their alleged injury. However, because they have no legal right to pay anything other than the promulgated rates, they have suffered no cognizable injury by virtue of paying said rates. Taffet, 967 F.2d at 1494 ("[I]njury implies violation of a legal right."). Absent a cognizable injury, the plaintiffs lack standing. Therefore, the Court concludes that the RESPA claims, contained in Counts 1 and 2 of the complaints, are barred by the filed rate doctrine and its fountainhead, the doctrine of standing.
Having made this determination, the Court addresses one final point. Although Congress has provided a private right of action in RESPA, it has declined to adopt rates for settlement charges, leaving this area to the states. These circumstances give rise to the following question: Are entities in Florida and other states that have set rates for those services immune from suit due to application of the filed rate doctrine? After positing a similar concern with respect to RICO and antitrust statutes, the Second Circuit has observed that, "While individual ratepayers are precluded form challenging the reasonableness of the rates, the proper government officials remain free to pursue this avenue in appropriate circumstances." Wegoland, Ltd. v. NYNEX Corp., 27 F.3d 17, 22 (2d Cir. 1994). With respect to Florida's title insurance rates, the Department of Housing and Urban Development ("HUD") has indeed taken steps in this direction.[22] Among their submissions, the plaintiffs have included a report entitled "Findings of HUD's Investigation of Florida Title Insurance Companies and Statement of Enforcement Standards", dated September 20, 1995.[23] HUD has found that some practices by some Florida title insurers and agents constitute violations of RESPA. Rather than pursue any enforcement actions on the basis of its findings, HUD chose to publish the report in hopes that the title insurance industry would take cognizance of the problems and correct them. Moreover, HUD provided the report to the Florida Insurance Commissioner for his use in the regulation of title insurance and the review of title insurance premium rates. In the plaintiffs' view, however, HUD's efforts, as well as those of the Florida Department of Insurance, have been ineffective. By filing these class action law suits, the plaintiffs "hope to play a part in curing the flaws that persist within the market for title insurance in Florida."[24] In taking up the cause of consumer protection, the plaintiffs have chosen an inappropriate vehicle to carry out their mission. The doctrines addressed by the Court  Burford abstention and the filed rate doctrine  as well as other arguments presented by the defendants which the Court did not need to reach, such as exhaustion of *1430 administrative remedies, are simply variations on the same theme. The problems which the plaintiffs have presented to this Court are best addressed by state legislative and regulatory bodies. Like Congress and HUD, this Court finds it appropriate not to usurp the task from the State of Florida.

4. The State Law Claims:

As previously noted, the plaintiffs also bring claims for fraudulent misrepresentation, negligent misrepresentation and violation of the Florida Deceptive and Unfair Trade Practices Act. As to these claims, which are contained in Counts 3, 4 and 5 of the complaints, the plaintiffs invoke the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(c)(3). Having disposed of the two claims in Counts 1 and 2, over which the Court had original jurisdiction, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, the Court dismisses Counts 3, 4 and 5 for lack of subject matter jurisdiction. Having dismissed all of the plaintiffs' claims, the Court shall dismiss all of the above-styled actions by separate order.

CONCLUSION
Based on the foregoing considerations, it is
ORDERED AND ADJUDGED as follows:
(1) Defendant Attorneys' Title's motion to dismiss first amended class action complaint (D.E. # 34 in Case No. 96-2445) is GRANTED as to Counts 1 and 2 with prejudice, pursuant to the filed rate doctrine. The motion is GRANTED as to Counts 3, 4 and 5 without prejudice for lack of subject matter jurisdiction.
(2) Defendant Attorneys' Title's motion to strike plaintiff's claim for punitive/exemplary damages (D.E. # 35 in Case No. 96-2445) is DENIED as moot.
(3) Defendant Commonwealth's motion to dismiss (D.E. # 30 in Case No. 96-2468) is GRANTED as to Counts 1 and 2 with prejudice, pursuant to the filed rate doctrine. The motion is GRANTED as to Counts 3, 4 and 5 without prejudice for lack of subject matter jurisdiction.
(4) Defendant Lawyers Title's motion to dismiss first amended class action complaint (D.E. # 27 in Case No. 96-2469) is GRANTED as to Counts 1 and 2 with prejudice, pursuant to the filed rate doctrine. The motion is GRANTED as to Counts 3, 4 and 5 without prejudice for lack of subject matter jurisdiction.
(5) Defendant Lawyers Title's motion to strike plaintiff's claim for punitive/exemplary damages (D.E. # 29 in Case No. 96-2469) is DENIED as moot.
(6) Defendant Chicago Title's motion to dismiss (D.E. # 23 in Case No. 96-2542) is GRANTED as to Counts 1 and 2 with prejudice, pursuant to the filed rate doctrine. The motion is GRANTED as to Counts 3, 4 and 5 without prejudice for lack of subject matter jurisdiction.
(7) Defendant Chicago Title's motion to strike plaintiff's claim for punitive/exemplary damages (D.E. # 25 in Case No. 96-2542) is DENIED as moot.
(8) Defendant Stewart Title Guaranty Company's ("Stuart Title") motion to dismiss plaintiff's first amended class action complaint (D.E. # 26 in Case No. 96-2706) is GRANTED as to Counts 1 and 2 with prejudice, pursuant to the filed rate doctrine. The motion is GRANTED as to Counts 3, 4 and 5 without prejudice for lack of subject matter jurisdiction.
(9) Defendant Stewart Title's motion to strike plaintiff's claim for punitive/exemplary damages (D.E. # 25 in Case No. 96-2706) is DENIED as moot.
(10) Defendant First American's motion to dismiss first amended complaint (D.E. # 27 in Case No. 96-2707) is GRANTED as to Counts 1 and 2 with prejudice, pursuant to the filed rate doctrine. The motion is GRANTED as to Counts 3, 4 and 5 without prejudice for lack of subject matter jurisdiction.
(11) Defendant First American's motion to strike plaintiff's claim for punitive/exemplary damages (D.E. # 29 in Case No. 96-2707) is DENIED as moot.
(12) Defendant American Pioneer's motion to dismiss plaintiff's first amended class action complaint (D.E. # 28 in Case No. 96-2708) is GRANTED as to Counts 1 and 2 *1431 with prejudice, pursuant to the filed rate doctrine. The motion is GRANTED as to Counts 3, 4 and 5 without prejudice for lack of subject matter jurisdiction.
(13) Defendant American Pioneer's motion to strike plaintiff's claim for exemplary damages (D.E. # 30 in Case No. 96-2708) is DENIED as moot.
(14) Defendant American Pioneer's motion for abstention (D.E. # 29 in Case No. 96-2708) is DENIED with respect to Counts 1 and 2. The motion is DENIED as moot with respect to Counts 3, 4 and 5.
(15) Defendant Fidelity's motion to dismiss (D.E. # 19 in Case No. 96-3088) is GRANTED as to Counts 1 and 2 with prejudice, pursuant to the filed rate doctrine. The motion is GRANTED as to Counts 3, 4 and 5 without prejudice for lack of subject matter jurisdiction.
NOTES
[1] First Amended Class Action Complaint at ¶ 17 in Morales v. Attorneys' Title Ins. Fund, Inc., Case No. 96-2445-CIV, ___ So.2d ___ (1997). An identical allegation is found at ¶ 17 in each of the complaints for the other cases, except in Dunn v. Fidelity Nat'l Title Ins. Co. of Pa., where it is found at ¶ 16.
[2] Black's Law Dictionary defines "title insurance" as, "Insurance against loss or damage resulting from defects or failure of title to a particular parcel of realty, or from the enforcement of liens existing against it at the time of the insurance. This form of insurance is taken out by a purchaser of the property or one loaning money on mortgage, and is furnished by companies specially organized for the purpose, and which keep complete sets of abstracts or duplicates of the records, employ expert title-examiners, and prepare conveyances and transfers of all sorts."
[3] See O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."). See also Lynch v. Baxley, 744 F.2d 1452, 1456 (11th Cir.1984) ("If the named plaintiff seeking to represent a class fails to establish the requisite case or controversy, he may not seek relief on his behalf or on that of the class."); Britt v. McKenney, 529 F.2d 44, 45 (1st Cir.), cert. denied sub nom. Burden v. McKenney, 429 U.S. 854, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976) ("If none of the named plaintiffs may maintain this action on their own behalf, they may not seek such relief on behalf of a class."); Salgado v. Piedmont Capital Corp., 534 F.Supp. 938, 953 (D.P.R.1981) ("It is well settled that to be a representative of the class on a particular claim, the plaintiff must himself have a cause of action on that claim.").
[4] See paragraph 10 of the complaint in every case, but in Dunn v. Fidelity Nat'l Title Ins. Co. of Pa., see paragraph 9.
[5] See paragraph 47 of the complaint in every case, but in Dunn v. Fidelity Nat'l Title Ins. Co. of Pa., see paragraph 44.
[6] See paragraph 48 of the complaint in every case, but in Dunn v. Fidelity Nat'l Title Ins. Co. of Pa., see paragraph 45.
[7] See paragraph 56 of the complaint in every case, but in Dunn v. Fidelity Nat'l Title Ins. Co. of Pa., see paragraph 53.
[8] See paragraphs 57 and 58 of the complaint in every case except Dunn v. Fidelity Nat'l Title Ins. Co. of Pa. In the latter complaint, the first allegation is found at paragraph 54, but the second allegation does not appear.
[9] See paragraph 3 of the ad damnum clause for Count 1 of the complaint in every case, except for Dunn v. Fidelity Nat'l Title Ins. Co. of Pa. In the Dunn complaint, the words "and title evidence" are omitted.
[10] See paragraph 3 of the ad damnum clause for Count 2 of the complaint in every case.
[11] See paragraph 6 of the ad damnum clause for Counts 1 and 2 of the complaint in every case.
[12] The quoted language is found at paragraph 21 of the complaint in every case, but in Dunn v. Fidelity Nat'l Title Ins. Co. of Pa., the words "and/or a split of the premium not commensurate with services actually performed" are omitted.
[13] As previously noted, the plaintiffs seek injunctive relief, as well as treble damages, in their RESPA claims. Under the clear teachings of Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996), discussed herein, and in accordance with the undersigned's analysis in Tax Cap Comm. (where the plaintiff sought preliminary injunctive relief), the Court finds that Burford abstention is appropriate with regard to the injunctive relief sought by the plaintiffs. The Court notes that, in response to the defendant's abstention arguments in Morales, the plaintiff states, "Should the court conclude that the limited equitable relief sought by Plaintiff renders this action dismissable on abstention grounds, Plaintiff respectfully requests leave of court to file an amended complaint omitting any request for equitable relief." See Plaintiff's Response to Defendant's Motion to Dismiss First Amended Class Action Complaint, at 26 n. 28, in Morales v. Attorneys' Title Ins. Fund, Inc., Case No. 96-2445-CIV. Extending this proffer to all of the cases, the Court deems all of the complaints amended to exclude their respective prayers for injunctive relief. Alternatively, the Court dismisses the prayers for injunctive relief in all of the cases on Burford abstention grounds.
[14] As noted by the Eleventh Circuit, the Racketeer Influenced and Corrupt Organizations Act, in section 1964(c), "allows a private plaintiff to recover for injuries that he has suffered to his business or property as a result of a violation of the criminal prohibitions in section 1962 of RICO." Taffet, 967 F.2d at 1486.
[15] The pertinent legislative and regulatory provisions are set out in the Burford abstention portion of this order.
[16] Fla. Stat. § 627.782(7) requires the Department of Insurance to review the promulgated rates for title insurance premiums "not less frequently than once every 3 years" and to revise the existing rates "if the results of the review so warrant." Moreover, rule making in Florida is governed by the Administrative Procedure Act, Fla. Stat. § 120.54. This provision includes elaborate requirements pertaining to public notice and the right to be heard prior to the adoption of rules, such as those governing Florida's title insurance rates.
[17] See Plaintiff's Response to Defendant's Motion to Dismiss First Amended Class Action Complaint, at 25, in Morales v. Attorneys' Title Insurance Fund. Inc., Case No. 96-2445-CIV. The same response is presented in the other seven cases.
[18] See Plaintiff's Response to Defendant's Motion to Dismiss, at 4, in Sutton v. Chicago Title Ins. Co., Inc., Case No. 96-2542 CIV. In accordance with the Court's treatment of these cases in a consolidated fashion, the Court deems this statement applicable to the other seven cases.
[19] In taking cognizance of the plaintiffs' approach to Count 5, the Court explicitly refrains from expressing any opinion as to the merits of this claim or the other two state claims. The Court's only purpose in this exercise is to elucidate, by contrast, the plaintiffs' theory of damages as to their RESPA claims.
[20] See Response to Notice of Filing Supplemental Authority, filed by the plaintiffs under the consolidated cases caption on July 24, 1997, at 8.
[21] See paragraph 4 of the complaint in every case, but in Dunn v. Fidelity Nat'l Ins. Co. of Pa., see paragraph 3.
[22] Congress has granted the Secretary of Housing and Urban Development authority with regard to regulatory, investigative and enforcement matters pursuant to RESPA. See 12 U.S.C. §§ 2617 and 2602(6).
[23] See Response to Notice of Filing Supplemental Authority, filed by the plaintiffs under the consolidated cases caption on July 24, 1997, Exhibit 2.
[24] See Response to Notice of Filing Supplemental Authority, filed by the plaintiffs under the consolidated cases caption on July 24, 1997, at 9.